Good morning, I'm here today to hear argument in case 23-6344, United States v. Trasacco. Good morning. We need some oil. Good morning, your honors. Andrew Gearing from the Federal Public Defender Office for the District of Connecticut on behalf of defendant appellant John Trasacco. I would like to spend my time this morning principally on the sentence the district court imposed on Mr. Trasacco and why when the record is considered in its totality, a 96-month sentence was substantively unreasonable. The sentencing transcript leaves the reasonable reader and the public with the impression that Mr. Trasacco received an outsized sentence because he elected to go to trial and because he could not pay restitution. And that his co-defendants received lenient sentences because they pled guilty and accepted responsibility. There's no dispute about the guidelines calculation in this case. Mr. Trasacco's guidelines were 33 to 41 months. The sentence imposed was more than twice the top of the guidelines and very nearly three times the bottom of the guidelines. I cannot recall a case in our district where the sentence was more than twice the top of the guidelines range. Upward departures are extraordinarily rare in our district. Even guideline sentences are becoming less and less common as most defendants generally receive below guideline sentences. According to the 2023 source book, only 22% of defendants in our district received guideline sentences. Well, the district court repeatedly commented on your client's failure to accept responsibility, drawing contrast to co-defendants who did. But at the same time, in the same breath, would repeatedly say, well, I don't calculate, I don't take that into consideration when I'm sentencing. How are we to handle that? Throughout the sentencing proceeding, Your Honor, there were numerous remarks from the district court indicating that Mr. Trasacco was penalized for going to trial. At the beginning of his sentencing, the judge emphasized that his co-defendants had all pled guilty and that he had not. That's what I just said. I mean, it's pockmarked with comments about your client's failure to accept responsibility. What's his name? Judge Williams. Judge Williams. That caught his attention. But he would also say, well, you know, I don't take that. He has a right to go to trial. So on the one hand, you should have accepted responsibility. On the other hand, you had a right to go to trial. How do we handle that? Well, I think, Your Honor, that Mr. Trasacco's decision to go to trial and maintain his innocence was linked to the sentence in the court's mind to the extent that it was inappropriate, considering that there was no obstruction, Mr. Trasacco did not testify at trial, and that the disparity between the top of the guidelines and the sentence imposed is just cannot bear, is too large to bear just the weight of that decision. There has to be some other reason to justify a sentence imposed three times at the top of the guidelines. Is there a case – actually, I was at the podium many, many years ago making your argument on behalf of the government in connection with a downward variance and making the exact same argument, and the response back from my future colleagues was, well, in fraud cases, there is no similar – is there a case, maybe I'll put it this way, where in a fraud case, we have determined that a sentence was substantively unreasonable. As opposed to a case involving child pornography, for example, or terrorism, is there a case involving a set of facts like this where a defendant has gone to trial and been convicted and the judge has imposed a significant upward variance that we've determined was substantively unreasonable? I'm not aware of such a case, Your Honor. I think perhaps part of the explanation is that upward departures are exceedingly rare and that a defendant – when a defendant elects to go to trial, the judge tries to avoid the appearance of a trial tax. And in this case, where you have a sentence, again, three times at the top of the guidelines, that's what it looks like. So there were other factors, and I'm just really asking a question that seemed to motivate the upward variance, including the fact – maybe the most salient fact – that the fraud was in connection with or arose in the midst of a pandemic, where services and pandemic or COVID-19-related products were at a premium and your client was convicted, one, I think, could argue, of exploiting that. And why isn't that the basis by itself for a significant upward variance from the routine case? It's a COVID penalty, not a trial penalty. I think, Your Honor, if the court had similarly treated Mr. Trosakos' co-defendants, for which that was also true – it was a COVID fraud, the funds were intended for COVID relief – then it would be a different story. But here, when we are looking at the disparities in the sentences between the co-defendants, I think it's significant that the court only cited that as a basis for an upward departure in Mr. Trosakos' case. Well, there is a slight built-in penalty, of course, even under the guidelines. But it's also true that if someone does not – even at sentencing – accept responsibility, which is what I think happened here, would that be a basis for an upward variance? It could be, Your Honor. I think a significant fact here is that Mr. Trosakos had maintained his innocence even past the verdict. We had post-trial motions, which the court did not deny until 8.30 p.m. the evening before the sentencing at 10 a.m. the next morning. Mr. Trosakos could have reasonably expected that the court would grant those post-trial motions. So I think the court was perhaps expecting a bit too much in demanding full-throated acceptance for Mr. Trosakos, given his arguments, his good-faith arguments as to why the jury's verdict should not stand. And I think that's linked to the question of restitution to the extent that the court seemed to expect Mr. Trosakos to have paid upfront restitution while he was still maintaining his innocence. And, of course, if he had done so, the government could have pointed out, how can he say he's innocent? He's paying restitution. He's acknowledged to some extent that he owes this money. And, of course, restitution is the other issue in our brief as far as being the basis, whether stated or not, for the court's upward departure. And this is just a very unusual case in that the district court seemed very preoccupied with restitution. There was this peculiar notice on the docket in December asking the parties to state what funds they had available for upfront restitution at the beginning of the sentencing proceeding for Mr. Trosakos. I don't recall this standard procedure up in Connecticut. I don't recall seeing that before. I was a district court judge. We never did that in SDNY. I have never seen anything like that before, Your Honor. What was he thinking about? Why were we dealing with restitution at that point in the proceedings and requiring people to pay it? What was he doing? I'm not sure, Your Honor. I think it may be something that's more common in state court practice, but in federal district court it seems very unusual. And when considered in conjunction with remarks about restitution throughout sentencing suggests that Mr. Trosakos' failure to pay up for it in restitution was driving the sentence in the way that was in process. Is there something in the record that we're missing? Why is this – who is this man, Williams? Why Williams – I can't speak for my colleagues. My clear takeaway from this record is Williams had an out for your client. Is there something we're missing in the record that accounts for this hostility and treatment of your client? Is there something that we're not seeing? Your Honor, we were shocked throughout. And I think that's why we highlighted the remand issue because that, again, is another irregularity. The court ordered Mr. Trosakos remanded first after he was convicted. He was released a couple days later after we provided additional sureties, and there were no issues between then and sentencing. But the court ordered his immediate remand, which is extraordinarily uncommon in our district for a defendant who's been at liberty and which we almost never see in fraud cases. What was the reason for remanding him on the spot? What was that all about? I think the court stated that since Mr. Trosakos had received a lengthy sentence, things had changed. But it wasn't clear to me from the record whether that was related to risk of flight or the danger to the community. The BOP does not like that. The BOP much prefers self-surrender. So I couldn't figure this out. When I read this record, I kept saying there must be something going on here. It's just not disclosed in the record. It would have made a lot more sense to allow Mr. Trosakos to self-surrender because he was remanded immediately. He went to California for reasons that are unknown to us. It took him a while to get transferred back to a camp in the northeast, whereas had he been allowed to self-surrender, I think we would have gotten the designation that we wanted. He would have been able to self-surrender to a camp. Has he been incarcerated since that remand? Yes, Your Honor, since the date of sentencing, a little over a year. So the remand, of course, means he didn't have the opportunity to say goodbye to his friends and family. No, Your Honor, and because the advice you give our— We objected strenuously below, Your Honor. We made the point that we advise our clients based on what we see, what is common practice. And based on that, although of course we tell our clients that it's up to the judge and we don't know what they're going to do— Did the government seek remand at the following conviction? The court inquired of the government as to their position, and the government stated that remand would be appropriate in this case and supported by the law. No, did the government ask for remand before Judge Williams asked the government about it? No, Your Honors, I don't believe so. I think the sentencing court sort of launched into the remand issue right after imposing sentence and only afterwards provided an opportunity for counsel to be heard. Okay. On both the trial penalty question and the restitution question, the colleague grazed this a little bit, but on both we have expressed statements from the judge refuting that proposition, quoting on restitution. He says he will not receive a greater sentence for any inability to pay restitution. So to conclude, in your favor on that argument, we would have to assume what? That the judge was making a false statement there? Or how would you propose dealing with the district judge expressly disavowing the basis upon which you build your argument? We're asking the court to look at the record in totality and to note other remarks by the judge that we have pointed out. One I'd like to highlight, page 19 of the sentencing transcript. The court notes, the way that Mr. Kosako is distinguishable, and not in a good way, from the other co-defendants. Each co-defendant accepted responsibility and did so relatively quickly. And as we pointed out in the sentencing, the relatively quickly part was not true for Mr. DeMassa. But throughout the sentencing transcript. Was that irresponsible? Let me ask you a more open-ended question. What was that in response to? An argument pointing to the co-defendants and saying, I think, that he deserved a somewhat similar sentence. Is that wrong or is that right? We were seeking a minor role departure. And to that extent, we certainly tried to distinguish Mr. Kosako from his co-defendants. And so that statement that you read from Judge Williams was in direct response to the argument. Is that a fair characterization? I don't think so, Your Honor. Your Honor, it appears in the transcript, before the defense made any presentation, while the court was engaging with the government, the court started articulating its reasons for the sentence during the government's presentation, which seemed strange, before the defense had even had an opportunity to be heard. So I'm not sure it was responsive to that. But in the briefing, you made all those arguments, correct? We certainly tried to distinguish Mr. Kosako from his co-defendants, Your Honor. And I think overall, we showed that Mr. Bernardo and Mr. DeMasa were much more culpable to the extent that they were in a position of extreme public trust. Mr. DeMasa was a sitting state representative. All right. Thank you. We've heard – well, you've reserved some time for rebuttal. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, Raymond Miller representing the United States. The above-guideline sentence imposed by Judge Williams in this case comports with the prior case law of this circuit, was not so high that it damaged the administration of justice and was substantially reasonable for at least seven separate reasons. First, as Your Honor indicated early on, this was a theft, not of money in a bank. This is a theft of COVID-19 funds at a time when those funds were needed desperately by municipalities. All the defendants were involved in that. So what distinguishes Mr. Tarasso from the others, including the ringleader who was a public official? That's a very good question, Your Honor. It is a good question. So let me hear your answer. Two-part answer. You don't have to vet the questions. Just answer. Sir, sir, sir. There's two things. First of all, when you look at the way the conspiracies worked, unlike Mr. Bernardo and Ms. Knox, this defendant drove this conspiracy. This defendant – Bernardo got twice as much money as this defendant. I don't think that's accurate, Your Honor. He got what? One hundred – he got a million two out of this. If my recollection is there's three conspiracies, Mr. Bernardo and Mr. DeMasso. In a scheme devised and implemented by Mr. DeMasso, he stole $600,000 about with the Compass Investments. It was established at sentencing that Mr. Bernardo only got $50,000 of that. Mr. DeMasso took everything else. And so in the aggregate, DeMas – what's his name? DeMasso. DeMasso is running more than one scheme. He's getting a million two. He gets a fraction of Mr. Tarascaso's – Mr. DeMasso, under the facts, started two schemes. Mr. Tresacco started this scheme. Mr. Tresacco found out about the scheme that Mr. Bernardo and Mr. DeMasso were running. The judge was entitled to look at the entire course of conduct, relevant related conduct. He knew what Mr. DeMasso had done, and he knew how much money DeMasso had made. And it was substantially more than this defendant, and he got a fraction of the sentence. He was also the – he also testified at trial. Was he another cooperating witness? Yes. Yeah. And so he got the benefit of a submission from the government. He did. That described the quality and level and degree of his cooperation. Yeah. The public record reflects he testified for, I think, over two days at trial. But the difference between the co-defendants with the source of the money being COVID-19 is that it's a mitigating factor for all of them. The two other co-defendants got lesser sentences, had a lot of mitigating factors that Mr. Tresacco doesn't have. Neither had criminal histories. Ms. Knox has suffered an abusive childhood and was six months pregnant. Mr. Bernardo was somebody who went along with Mr. DeMasso in the Compass scheme. But the criminal history was factored into his points. That was already on the table. That's correct, Your Honor. Criminal history is quantitatively calculated. But a number of Mr. Tresacco's convictions, including a robbery one and an assault one, I believe, which in the Connecticut law involves violence, they didn't count. And it's, for example, in United States v. Pope, a bank burglar case that the judge went above roughly twice the top of the range, the circuit court says, the Second Circuit says that these factors were in part informed by his criminal history, and that's okay. And that's what Judge Williams did here. Judge Williams had a materially different defendant in Mr. Tresacco in front of him than he did in Ms. Knox or Mr. Bernardo. This was a defendant who lived his life almost entirely outside the law. This was a defendant with multiple violent convictions. This was a defendant— When was the last—when was the most recent conviction? For Mr.—I can check in a moment, Your Honor. The most recent conviction was in, according to the PSR, Your Honor, in 2007 for illegally refusing a DNA test, which scored zero points. He also had a 2006 conviction for the same thing, which scored zero points. He had a 1999 conviction. And he was arrested on this charge? He arrested him in— During the pandemic. During the pandemic, Your Honor. It seems like a long—yes, 2021. Did the government advocate for an above-guideline sentence? Yes, in Mr. Tresacco's case. The government, which is—I agree with my colleague, they're rare, and I have moved maybe ten times in my career for one, but I moved—the government moved for an upward departure in this case because I—the government felt that— Upward variance. An upward variance. Variance, not a departure. Thank you, Your Honor. Yes, an upward variance. Because in my view, that Mr. Tresacco's criminal history, the nature of the conspiracy where he basically, in the government's view, intimidated Mr. DeVosso or coerced him into continuing along with the various iterations of the $400,000 fraud— DeVosso was involved in other scams that this man had nothing to do with. So the notion that he was coerced into this is unconvincing to me. Well, the difference between those two, Your Honor, is that in the other scams, in the youth violence scam and the competence investment scam, DeVosso has taken a lion's share of the money. The other two individuals were facilitating it because it helped the scheme look more legitimate. This is a horse of a different color, Your Honor. This is a scheme initiated by Tresacco who just took all the money, all of it. And he slid on two occasions $5,000 into Mr. DeVosso's pocket. Can you tell us, based on the trial evidence or other evidence, why it is that the relationship between Mr. Tresacco and Mr. DeVosso developed in that way, where Mr. Tresacco was the lead and seemed to have some more—a greater role? In the testimony at trial that Mr. DeVosso related that's in the government's appendix, Mr.— and this is my recollection, I'm not quoting from the transcript— Mr. DeVosso is introduced to Mr. Tresacco by Mr. Bernardo at a cigar club in Connecticut. Mr. Tresacco immediately indicates that he can do some gambling, and then that's—the individual is centered at a restaurant. And then everything moves to that restaurant. So the—and then Mr. Tresacco— Is Mr. Tresacco aware that Mr. DeVosso is a gambler and has gambling debts, or—? I believe the testimony was Mr. DeVosso indicated he gambled at that first meeting with Mr. Tresacco. And so Mr. Tresacco provided an opportunity for him to gamble additionally, and Mr. DeVosso took that opportunity. And was there evidence that the nature of the—from that—from the beginning, the nature of the relationship between those two changed or developed to give Mr. Tresacco more power? It was a very one-sided relationship in Mr. DeVosso's accounting of it, in that he would see him at the restaurant, and then Mr. Tresacco would hand him invoices for—and there were two parts to the Tresacco conspiracy. One was L&H, which allegedly provided PPP for the schools. And then once Mr. DeVosso said, we're not getting sufficient product here, we're going to get uncovered, they then switched it to JIL, JIL conspiracy, which was providing UV light cleaning for municipal buildings, some of which were closed. And so Mr. Tresacco was driving all of that. Mr. Tresacco was giving Mr. DeVosso the invoices. And you said, I think, that that's different from the other schemes with which I'm less familiar. Yeah, the other schemes, the one—they were driven by Mr. DeVosso, straight up. And what Mr. DeVosso did there is he—he was—my recollection of the testimony is that Mr. DeVosso started defrauding West Haven with his—Ms. Knox, who he had a relationship with through a youth violent conspiracy by sending false invoices. Then the mayor put him in charge of all the COVID funds, which is about a million bucks from the government. And then he just really saw an opportunity because he could be the signatory for that. So he—then he and Mr. Bernardo formed a company called Compass Investments and submitted completely fraudulent invoices. And you're okay with him getting a slap on the wrist, public official doing that? I—the government didn't recommend a sentence, as is our practice in Connecticut? The what? The government filed a motion on his behalf. So I think—I think the judge opposed an appropriate sentence, given what was in front of the judge at that time. And, well, look, he was a cooperator. Yeah. And so you've got to—the government sometimes, as I understand it, has to make agreements with people who engage in serious misconduct. Correct. Is there anything— But the judge sentenced him. I'm sorry, sir? The judge sentenced him. You didn't. The judge sentenced him, yes. And in—the practice in Connecticut is that when we file a motion on behalf of a defendant, we do not recommend a sentence. It's been that way for a long time. So we do not— So the judge had no idea what you thought the sentence should be, right? I—the judge took—the judge knew that I thought he should take into account Mr. DeMoss's cooperation and testimony. And the judge—the judge was in a really good position in this case, unlike many situations, because the judge observed his testimony for over a day, two days, whatever it was. Why was Judge Williams so fixated on the fact that this defendant didn't accept responsibility? He kept mentioning that. I think that goes specifically to— Was he upset about that? Was he angry about that? I think it was an observation. And that's sort of an observation that before in U.S. Kilkenny, which is a fraud case that went from 121 at the top to 216, and there, one of the reasons was the defendant made cavalier comments to probation. This—the judge observed how this defendant acted. The judge observed a financial affidavit that was turned in, which was unique. It, you know, it had things written on it, such as, you know, I have no idea. God only knows if I owe the IRS. You know, and then further, the defendant stated that he had no assets. The financial affidavit reveals no assets, yet he tries to—he, in his argument to remain out, says I have to shut up, I have to wind down my multiple businesses that I have. And I think the judge says at some point, you know, what do you mean you need time to wind down these businesses? These are the businesses you report have no assets? You know, and so I think that sort of, you know, that those sort of occurrences and the judge observing that is sort of a foundation for his reaction. Nothing further, Your Honors? Thank you very much. Thank you. Your Honors, if I could just briefly address the criminal history question. Mr. Tresacco was convicted of Assault 1 and Robbery 1 in 2000. The assault offense occurred in June 1999 when he was 28. The robbery offense occurred in February 1998 when he was 26. Comparison, he was 49 to 50 years old at the time of this offense. He was criminal history category 2 for a reason, and the government asked the court for a criminal history category departure under 4A1.3. The court did not do that. The court didn't check that box. Instead, the court kept him at criminal history category 2, but essentially punished him for a criminal history, which I think was also inappropriate. And as to restitution, I have a special concern to how the judge conducted this as to indigent clients like Mr. Tresacco. Most of my office's clients have not paid taxes in recent years. Many have little or no verifiable income. That's how they qualify for our services in the first place. So I worry about, unless the court takes action, this being seen as an aggregating factor in more and more cases with this court, which would create unwarranted disparities, harming probably the most vulnerable people in our legal system. This is with respect to the restitution issue? Exactly, Your Honor. So can you just address the government? I am very sympathetic to what you're saying there. But would you address the government's argument or statement that he talked about having to wind down his company but then also said, I've got no assets, and apparently Judge Williams, as I understand it now, believed that there was some internal contradiction? Well, we know from the record evidence at trial that Mr. Tresacco had a company that made and sold products, had a warehouse. Mr. DeMassa said he had been there about five times and had seen goods. So we know that there were physical materials that Mr. Tresacco wanted to dispose of. We know that he paid rent for the space. And none of that hit the financial affidavit? No, Your Honor, but it's not uncommon when clients are completing these affidavits that to the best of their recollection they don't have the best available information. But, I mean, not many of your clients have warehouses and businesses that need winding down. That doesn't sound like the most vulnerable population. Well, Your Honor, I think even small business owners were very vulnerable during this time. The sentencing was in 2023 after COVID. A lot of businesses were struggling. As we said at sentencing, nobody wanted to touch Mr. Tresacco after this case became public. Nobody wanted to work with him or do business with him. But it's a business with books and accounting and the like, and yet it reflects no assets. I mean, it's hard to see that the judge noting that for purposes of how he thinks about the restitution is irrational or abuse of a discretion or a clear error or whatever it would be. How do you view that? We're not saying it's not relevant, Your Honor. We're just saying that it's not sufficient to justify this vast disparity with his co-defendants. Was he counseled at the time he was filling out the financial form? Yes, Your Honor. He was represented by our office throughout. I just want to point out briefly, if I could just have a moment, Your Honor. Mr. Tresacco's co-defendant, Mr. DeMasa, got numerous extensions and finally self-surrendered in December 2023. He's due to be released in October 2025 after less than two years in prison, probably significantly less time considering halfway house or home confinement time. Lauren Knox served 150 days. John Bernardo served a little over 250 days in prison. So the government points out at least two things, and I'm going to give you an opportunity to respond to those on this rebuttal, although you're past your time, if that's okay. Thank you, Your Honor. The first is that Mr. DeMasa is significantly differently situated by virtue of his cooperation. That's right, Your Honor. We certainly credit that. Which is a significant thing when the government submits a letter. And, you know, you could talk about the justice of injustice, whether he's the top guy and cooperating downward or across and so on, but there is great value to coming in and cooperating, and I think you would agree with that. And credit associated with that. The second thing is that the government mentioned various mitigating factors associated with Mr. Bernardo and Ms. Knox that were not present with respect to Mr. Tresacco. So if you would address both of those. Certainly, Your Honor. Mr. DeMasa cooperated. He should be credited for that. He received a sentence slightly below the guidelines. We are not saying that that's an inappropriate sentence. We're just saying that Mr. Tresacco's sentence was so much higher that it's an unwarranted disparity. And it's not just that they're similarly culpable and Mr. DeMasa cooperated. Mr. DeMasa was much more culpable. The government said at sentencing in response to questioning from the court that none of this would have been possible without DeMasa. We know that because he was given special responsibility from the mayor to administer these COVID funds. He was both a city employee and an elected state official. So John Tresacco, who's an outsider with no political connections, with no established position in West Haven, is in a very different position. John Bernardo, too, was a city of West Haven employee who, as somebody who had worked in public service as a city of New Haven employee for most of his career, should have known better. And he also had significant political influence. He was Mr. DeMasa's campaign manager and was heavily involved in democratic politics in West Haven for decades. I should also note, as the government mentioned, the COMPASS scheme, that of the four schemes, that's the one that resulted in the largest loss amount. I believe it's about $600,000. And as part of that scheme, Bernardo and DeMasa created a fictitious shell company. They used Bernardo's home address as the address for the company. They set up something through HR so that money could go to Bernardo's retirement through that scheme. Much more sophisticated than the alleged JIL and L&H schemes. So it's not that there are no mitigating characteristics for these defendants. I'm sure there are. It's just that considering the aggravating factors that were present for them, particularly their public role, it's just too much of a difference to have them in and out of jail and have Mr. Tresacco expected to be incarcerated until 2029. Thank you very much.